**OAKWOOD CLUB, a Corporation, Appellant, v. SOUTH EUCLID (City) et, Appellees.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 24953. Decided March 29, 1960.

Ulmer, Berne, Laronge, Glickman & Curtis, for appellant.
Clifford H. Bernard, Director of Law, South Euclid, Ross Sipari, for appellees.

(HUNSICKER, J, of the Ninth District, GRIFFITH, J, of the Seventh District, McLAUGHLIN, J, of the Fifth District, sitting by designation in the Eighth District.)

## OPINION

By HUNSICKER, PJ.

This is an appeal on questions of law and fact from a judgment entered in the Court of Common Pleas of Cuyahoga County, Ohio. The case is hence being heard de novo in this court.

Oakwood Club, a corporation, owns a large tract of land which is situated partly in the city of South Euclid and partly in the city of Cleveland Heights. On this land the Oakwood Club, for the benefit of the members who own the corporation, has constructed an 18-hole golf course, a club house, and related facilities. One-third of the golf course lies in the city of South Euclid, and on this part of the land there arises a natural watercourse which flows generally from south to north and empties into Nine Mile Creek, which creek in turn empties into Lake Erie.

Because of the natural watershed area, and some small tributary streams that run into this stream, which runs through the golf course, the city of South Euclid has, by the construction of sewers, taken advantage of this natural watershed to drain surface waters only, from much of the land lying adjacent to the golf course.

The city of South Euclid, when it first constructed sewers to bring surface water to the stream on the golf course, was not densely populated, but with the building of new homes, streets, and the resulting improvement of the area, the city developed to such an extent that the area surrounding the golf course is now fully built up. Expert witnesses gave testimony to the effect that there could not be any further changes in the natural watershed that would increase the amount of surface water run-off after a rainstorm. The area has "reached its maximum run off."

Beginning with the year 1947, after every rainstorm, on a part of the low lying ground near the clubhouse and on some of the fairways nearby, flooding conditions have occurred. Such conditions have become worse until now a rainfall of one-half inch in intensity will produce a flooding of the area near the clubhouse and on some of the nearby fairways, tees and greens. When such rains occur, the golf course

cannot be used for the purposes it was designed to serve. The flooding conditions after each such rain last several hours, causing not only loss of use, but damage to bridges, grass and the golf greens. The volume of water has also caused erosion along the bank of the stream. The Oakwood Club, in order to facilitate the flow of this surface water through its land, has deepened and widened the stream and constructed new and wider bridges across this natural watercourse, but such work has not prevented the flooding and consequent damages to its land.

There is no great dispute as to what the evidence shows after a rain or its effect on the land of Oakwood Club. The great conflict in the evidence concerns the source of the water. Oakwood Club says that the city of South Euclid has diverted water from other watersheds into the stream flowing through the golf course. The city of South Euclid says it has only placed in this stream the natural flow of surface water, and that the volume is no greater than that which fell at all times on this watershed, although, by reason of the improvement and development of the land, an increase of volume and an acceleration of flow into the Oakwood Club creek has occurred.

The Oakwood Club says that the city of South Euclid has put into this stream more water than the capacity of the stream can accommodate, and has diverted surface water from other watersheds into this stream, thereby creating a greater burden of water than the Oakwood Club watercourse is required to receive. The Club also says that the city is about to construct a supplemental storm water sewer on two streets which, when built, will cast into the Club stream an increasing and accelerating flow of water across its lands, to its further great damage. It further says that it has no adequate remedy for these repeated trespasses upon its lands.

The Oakwood Club asks that this court enjoin the city from casting waters upon its lands in an amount greater than it is bound under the law to receive. It also asks that this court enjoin the city from constructing the sewer on the two streets (Miramar and Harwood) in such manner as to cause the water in such new sewers to come upon its property.

The city of South Euclid denies that it has diverted water from other watersheds onto the Oakwood Club lands, or that it proposes to do so by the Miramar and Harwood supplemental sewer. The city asserts that the Oakwood Club is receiving only such water as it must take as a lower or servient owner which possesses lands along a watercourse that is the natural surface water drain for lands within the city.

The testimony of the engineers, who sought to fix the boundaries of the natural watershed of the Oakwood creek drainage area, was in great conflict. The expert for the Oakwood Club gave two or three different figures as to the acreage that is not in the watershed, but whose waters are now diverted into the Oakwood Club streams. There are admittedly some areas, natural to the watershed under discussion herein, whose surface water has been diverted to other watersheds. We believe that it is not possible, because of the development of this area, to tell with any degree of accuracy where the natural watershed boundaries are. If, however, we assume that there is a diversion of water to this area

from other watersheds, the total of such water cannot exceed the amount of 12% to 15%, as testified to by the engineer employed by Oakwood Club. This increased amount of surface water does not materially affect the flood conditions that periodically occur on the golf course.

As we see the problem herein, it is: May a municipality so construct its storm water sewer system to cast surface water upon a landowner, through whose lands there runs a stream that is a watercourse which naturally drains the area covered by those sewers, thereby causing that watercourse to overflow its banks to the damage of the landowner?

If the land owner is not, by the law of this state, bound to accept this naturally increased and accelerated flow of surface water, is his remedy one in equity by injunction, or is he relegated to an action in damages?

The testimony of the witnesses, as it is found in the transcript, is to the effect that during periods of hard rains—that is of one-half inch or more—the stream does not have sufficient capacity to prevent a flooding of some part of the Oakwood Club grounds. The testimony is also to the effect that flooding conditions from surface waters occur in other parts of the city, and, if this water is not permitted to follow its natural course, many other homes will be in danger of flooding in a neighboring city.

The law, with reference to surface waters, has been definitely established by the pronouncement of our Supreme Court. If any change is to be made in the established rules, it is that court which must do so.

The leading case in Ohio is **Mason v. Commissioners of Fulton County, 80 Oh St 151,** wherein the court said:

"A landowner may, in the reasonable use of his land, drain the surface water from it into its natural outlet, a watercourse upon his own land, and thus increase the volume and accelerate the flow of water without incurring liability for damages to owners of lower lands; and his land is not subject to assessment for the cost of a ditch, or an improvement, that will not benefit its drainage but is constructed to prevent overflow from the watercourse or to benefit the drainage of servient lands."

This statement was but an affirmation of the rule set out in **City of Hamilton v. Ashbrook, 62 Oh St 511.** The first paragraph of the syllabus of that case said:

"1. A municipal corporation is not liable for damages caused by such increased flow in a natural water course as results from the improvement of lots and streets within the territory whose waters naturally drain into such water course. (**Springfield v. Spence, 39 Oh St 655,** followed and approved.)"

More recently, in the case of **Ratcliffe v. Indian Hill Acres, Inc., 93 Oh Ap 231,** where surface water from adjoining land owners was in dispute, the court said, at page 237:

"In the exercise of the rights of ownership, one of the usual and reasonable activities is the control and disposition of surface water and the facilitation of its final discharge in accordance with the contour of the watershed, and so long as no unreasonable or negligent act is

committed by the owner of the dominant estate, the servient estate has no cause of action, notwithstanding he may suffer some incidental damage or his burden be somewhat increased."

The case of **Nagy v. City of Akron, 27 Oh Ap 250,** was a situation where the sewer was taken outside of the city and thence surface water was cast upon the lands of Nagy. In that case the statement, with respect to the capacity of the stream being exceeded, is not controlling in the action herein. The other cases bearing on this point of capacity of the sream, as cited to us by counsel for Oakwood Club, can be distinguished on the facts of each case, and hence we do not consider such cases to establish a principle different from the cases cited above.

There is the direct pronouncement in the case of **McCoy v. Rankin, 35 Abs 621** at p. 626, that "the dominant land owner may in the reasonable use of his land drain the water from it into its natural outlet and thus increase the volume and accelerate the flow without incurring liability. He may not do this beyond the capacity of the watercourse in its natural drainage, and if he does so he is liable."

This brings into focus the capacity-of-the-stream rule found in other jurisdictions, but never adopted by any pronouncement of the Supreme Court of Ohio. The capacity-of-the-stream rule is, of course, mentioned, with citation of authorities, in 93 C. J. S., Waters, Sec. 117, at p. 817, note 32; 56 Am. Jur., Waters, Sec. 74, at p. 561, note 13; 28 A. L. R. 1262, subdivision III at p. 1267; 2 Farnum, Waters & Water Rights, Sec. 488.

Two rules with respect to the capacity of streams have been adopted in our country, and they are as far apart as the country is wide.

One view of the rule is found in Noonan v. City of Albany, 79 N. Y. 470, in which case the court determined that the right of a riparian proprietor to drain the surface water on his lands into a stream which flows through them, is not an absolute one under all circumstances; that it does not authorize the throwing into a small stream surface water, by means of ditches and drains, when, by so doing, the stream will be filled beyond its natural capacity, and will overflow and flood the lands of a lower proprietor.

The contra view is held by the Courts of California, where, in the case of San Gabriel Valley Country Club v. Los Angeles County, 188 P. 554, at p. 558, 9 A. L. R. 1200, the court quoted with approval an excerpt from the note by Mr. Freeman in 85 Am. St. Rep. 707, at p. 733:

"* * * So far as streams or natural watercourses are concerned, there can be no doubt that one may drain into them, and thereby increase their volume without subjecting himself to liability for any damage suffered by a lower owner."

See also: Youngblood v. City of Los Angeles, 325 P. 2d 587.

A lower riparian owner, along a watercourse, must expect that, as the upper lands are built up with homes and stores, much of the water which was absorbed by the land will now run off of hard surfaced streets and the roofs of buildings, to seek its natural outlet in the channel developed with the contour of the land.

We therefore say, in the instant case, that: where a watercourse exists on the land of an upper proprietor, he may collect the surface water

arising on his land into sewers or drains, and discharge it into such watercourse without liability to the lower owner; so also a municipality may collect, into sewers, the surface water which comes from a watershed area within its borders, and discharge it into such watercourse, without liability to the lower owner, even though in so doing incidental damage may occur to the lower proprietor.

We herein determine that the damages which Oakwood Club suffers, as a result of this flooding, are a natural result of the contour of the land, and under the law of this state are damnum absque injuria.

The petition to enjoin the city of South Euclid is dismissed, at the costs of Oakwood Club.

Petition dismissed.

GRIFFITH and McLAUGHLIN, JJ, concur.