MUNN ET, PLAINTIFFS-APPELLEES, *v.* HORVITZ COMPANY ET, DEFENDANTS-APPELLANTS.

Ohio Appeals, Eighth District, Cuyahoga County.

Nos. 25951 and 25953.   Decided July 6, 1962.

460

*Messrs. Merkel, Campbell, Dill & Zetzer, Mr. Russell B. Day, Mr. Reese Dill* and *Mr. Ernest P. Mansour*, for plaintiffs-appellees.

*Mr. Mark McElroy*, attorney general, and *Mr. Alan M. Wolk*, assistant attorney general, for defendant-appellant, State of Ohio.

*Mr. Robert Krupansky*, for defendant-appellant, City of Mayfield Heights.

SKEEL, J. This appeal comes to this court on questions of law and fact from a decree entered for the plaintiffs after trial in the Common Pleas Court of Cuyahoga County. The plaintiffs, with the exception of the Village of Gates Mills, a municipal corporation, which became a party plaintiff by intervention and agreement, are all residents and landowners in a part of the Village of Gates Mills situated in what can be described as the "Deer Creek" Watershed located north of Mayfield Road and East of SOM Center Road.

One defendant, the City of Mayfield Heights, is a municipal corporation in part located contiguous to and west of Gates Mills and through which Mayfield Road (U. S. Route 322) (running in an easterly and westerly direction) and SOM Center Road (State Route 91) (running in a northerly and southerly direction) run, said roads intersecting near the northeasterly border of the city. Another defendant, The Horvitz Company, an Ohio corporation, is a construction company holding a contract with the State of Ohio for the construction of a section of the "North-South" limited access highway which proceeds

in a general northerly and southerly direction just west of SOM Center Road and at this point through the City of Mayfield Heights. The remaining defendants are Edwin T. Frantz, Mayor of the City of Mayfield Heights, Gilbert Donovan, Division Engineer of the Department of Highways, State of Ohio, and Everett S. Preston, Director of Highways of the State of Ohio.

The amended petition in part alleges that the building of said limited access highway is under the direct supervision and control of the defendants, that the construction company has begun to construct a storm sewer in Mayfield Road beginning at or about the location of what is known as "Golden Gate Shopping Center" and proceeding from there through the intersection of Mayfield Road and SOM Center Road "to a point within approximately one hundred (100) feet of the common boundary line between Mayfield Heights and the Village of Gates Mills, where the said storm sewer shall end and discharge its flow of water over the lands and past the homes of the plaintiffs and other residents of the Village of Gates Mills."

The undisputed fact is that this sewer now in the process of construction, if permitted, will empty into Deer Creek, a natural stream which passes under Mayfield Road at the point indicated and from there proceeds northerly and at points easterly until its flow of water empties into Chagrin River, some 9000 feet from Mayfield Road and will parallel the easterly part of an existing forty-eight inch (in part) storm sewer which was constructed in 1925.

It is alleged that the new storm sewer is to be six feet in diameter, that it will collect and drain surface waters from Golden Gate Shopping Center and SOM Center Road and from East Gate Shopping Center. Golden Gate Shopping Center is just west of the new throughway on the south side of Mayfield Road, its buildings and paved parking space covering about fourteen acres. It was built in 1954. East Gate Shopping Center is at the northeast corner of Mayfield Road and SOM Center Road, its buildings and paved parking area covering about forty acres. It was constructed in 1955. It is also alleged that other commercial buildings and residences will be built from which drain water will be collected and drained into the six foot drain water sewer. It is further alleged that there

is a forty-eight inch storm sewer which empties into Deer Creek at the same point where the six foot sewer will discharge its flow. In addition, it is alleged that in recent years during periods of rainfall the water discharged from the forty-eight inch drain sewer and other sewers into Deer Creek has frequently caused it to overflow and damage, by erosion, plaintiffs' lands and that said overflow has destroyed large and valuable trees. It is alleged that the flow of water crosses under Hickory Lane, a dedicated street in the Village of Gates Mills and farther on under a bridge on West Hill Drive, a dedicated street in Gates Mills. It is also alleged that any increase in the flow of water along this natural watercourse during these periods of rainfall will cause irreparable damage to the streets, bridges, and abutting properties.

It is further alleged that the unnatural diversion and collection of surface waters and the unnatural discharge of the same in such volume and rate of flow over the lands and homes of the plaintiffs will cause irreparable damage to the plaintiffs' lands and homes, that the defendants' conduct as alleged is a taking of plaintiffs' property without due process, and that "the construction of said sewer will divert said surface waters from their natural flow upon other lands than the lands of these plaintiffs to an unnatural flow upon the lands of these plaintiffs." The plaintiffs allege that they were uninformed that the seventy-two inch sewer would proceed east of SOM Center Road until two weeks before this action was commenced. The plaintiffs seek to enjoin the construction of the remaining part of this seventy-two inch storm sewer.

The answer of the Mayor of the City of Mayfield Heights after admitting the construction work in connection with the North-South limited access highway within the city, including the size, character and purpose of the drain sewer described by the plaintiffs, denies that the plaintiffs were uninformed of its proposed construction and alleges that it had been the subject of public announcement for two years before the work began and that all but a few feet of the sewer was finished before this action was commenced. It is admitted that the new six foot drain sewer (paralleling the present forty-eight inch sewer, which old sewer begins at Lander Road much farther to the west) will, as does the old sewer, drain storm waters col-

lected south of Mayfield Road beginning at the Golden Gate Shopping Center and from there easterly to SOM Center Road, including that drain water collected from homes and business places in that area, but denies that storm waters falling north of Mayfield Road, except for a very narrow strip of the frontage on Mayfield Road, will reach either the old or new storm sewer and denies that such sewer will collect the drain waters from the East Gate Shopping Center.

The answer also alleges that over the years the character of the neighborhood around the intersection of Mayfield Road and SOM Center Road has changed into a modern residential area with shopping centers, paved streets, apartment buildings, parking lots and the like, which accelerates (during rain storms) the flow of surface water into natural drainage areas. It is further alleged that Deer Creek at all times has been a natural watercourse within its natural drainage area which is in part located in the area of the City of Mayfield Heights, as described herein, that whatever development reasonably to be anticipated resulting in acceleration of drain water into Deer Creek does not create in the plaintiffs any legal right as lower riparian owners of land through which Deer Creek runs since their rights are servient to defendants' rights to the natural use of Deer Creek as upper riparian owners, that if any injury results it is "damnum absque injuria," that the construction of the new storm sewer will not drain surface waters not now draining into Deer Creek, and that the waters drained into Deer Creek are from its natural drainage area. It is also alleged that if there is a diversion, such diversion occurred in 1925, and has been open, notorious and adverse to the plaintiffs for over twenty-one years and, therefore, the City of Mayfield Heights and the State of Ohio have acquired a prescriptive right to continue as they have done from and since the construction of the forty-eight inch sewer in 1925 in the County of Cuyahoga.

It is further alleged that the plaintiff, the Village of Gates Mills, has constructed a culvert over Deer Creek inadequate to the needs of the stream and is responsible for creating flooded areas during heavy rains. It is also alleged that injunction is not the proper remedy under the circumstances, the plaintiffs having an adequate remedy at law,

The remaining defendants, by separate answers, deny that they threaten to do any unlawful act with respect to the plaintiffs to their damage or to take their property without due process of law, and by general denial, deny each allegation of the petition not admitted to be true. Both the defendant Preston and defendant Donovan challenge the jurisdiction of the court and specifically state that the answer required of them shall not be construed as an entry of appearance.

A reading of the transcript with the exhibits attached which has been presented to this court by stipulation as the evidence which the court shall consider in determining the issues of fact discloses the following facts, many of which are not in dispute and all of which are supported by the greater weight of the evidence.

In 1925 the County of Cuyahoga developed a storm sewer system in the territory of what is now in the easterly part of the City of Mayfield Heights referring particularly to Mayfield Road from Lander Road to a point five hundred feet east of SOM Center Road and the streets running north and south from Mayfield Road in this area. A storm sewer was laid in Mayfield Road from Lander Road to the Mayfield Road culvert over Deer Creek at which point such sewer empties into Deer Creek. The diameter of this sewer beginning at Lander Road is twelve inches and from there enlarges at many points depending on the grade of flow to forty-eight inches at the Deer Creek culvert. There were a number of small drain water sewers constructed in some of the streets intersecting Mayfield Road east of Lander Road connecting with the Mayfield Road sewer. There was also a drain water sewer constructed in Orchard Park Boulevard and connected with the Mayfield Road sewer flowing north and emptying into Wilson Mills Creek. A storm sewer was also constructed in SOM Center Road beginning about two thousand feet south of Mayfield Road and connected at the intersection of SOM Center Road with Mayfield Road with the Mayfield Road sewer. There was also a sixty inch storm sewer going northerly from Mayfield Road in SOM Center Road about five hundred feet and then turning easterly five hundred to five hundred twenty-five feet as a forty-eight inch sewer running into a ditch which emptied into Deer Creek. The construction of this described drain

sewer was a WPA project, the work having been done in 1938 or 1939. The portion of the sewer that turned east five hundred feet north of Mayfield Road was laid in a natural drainage channel which originated on the westerly side of SOM Center Road, proceeded easterly through a culvert, and before the sewer was built, there was a ditch from this culvert which emptied into Deer Creek.

There are three watersheds which run in a northerly direction across Mayfield Road in the territory through which the Mayfield Road sewer passes between Lander Road and Deer Creek. Beginning at Lander Road and going east they are known as the Wilson Mills Watershed, the Andrews Watershed and the Deer Creek Watershed. In the case of the Wilson Mills Watershed there was not a sufficient collection of water to create a swale or stream south of Mayfield Road to require a culvert to protect such road from the flow of surface water. In fact the very beginning of Wilson Mills Creek was noted by a plaintiffs' witness as being several hundred feet north of Mayfield Road. This same fact situation is equally true of the Andrews Watershed except that the point at which the stream originates as indicated by the same witness is probably not more than three or four hundred feet north of Mayfied Road. The beginning of Deer Creek, however, was indicated as being well south of Mayfield Road.

The construction of the Mayfield Road drainage sewer in 1925 with a connecting sewer running north in Orchard Park Boulevard which is located near the most easterly boundary of the Wilson Mills Watershed, which drain sewer empties into Wilson Mills Creek, was planned by the Cuyahoga County Sanitation Department. It was intended by the general plan to and, at the time, did solve surface water drainage problems for the land lying south of Mayfield Road and just a very narrow strip to the north from Lander Road to SOM Center Road. Just how much of the drainage collected from the Wilson Mills and Andrews Watersheds is diverted north to Wilson Mills Creek through the sewer in Orchard Park Boulevard is not disclosed by the record. That there must be a considerable flow north in the sewer under Orchard Park Boulevard from the Mayfield drain sewer is evidenced by the change of the diameter of the Mayfield sewer at that point from forty-two

inches to twenty-seven inches.  In fact the testimony of a defendants' witness that there is no way to determine this fact is not controverted.

The territory drained by the Mayfield sewer plan of 1925 has had a considerable residential and commercial development since 1950.  Many streets have been paved and houses and commercial areas built so that the surface water collected and disposed of through sewers rather than seeking a common channel by seepage through the ground has increased considerably. The East Gate Shopping Center at the northeast corner of Mayfield Road and SOM Center Road covers an area of forty acres either with buildings or hard top parking lots.  Golden Gate Shopping Center on the south side of Mayfield Road just west of the new freeway covers about seventeen acres with like improvements.  The plaintiffs' evidence is to the effect that no noticeable increase in the flow of Deer Creek occurred until after East Gate was built.  It must be remembered that East Gate is within the natural drainage area of the Deer Creek Watershed.

The new freeway now under construction passes through the two most easterly watersheds, that is, Andrews and Deer Creek.  Most of this construction is in the Deer Creek watershed, including three of the Cloverleaf interchange quadrants. The northwest quadrant of such interchange in which a retention basin has been constructed is drained into Andrews Creek. The construction of the freeway included the building of the seventy-two inch drain sewer which is the subject of this action, and which is built parallel to and is interconnected with the Mayfield Road surface drain sewer.  The southerly segment beginning just west of the easterly border of the Golden Gate Shopping Center proceeds easterly and just past the center of the freeway, and the northerly segment being on the north side of Mayfield Road beginning west of the right of way of the freeway runs from there eastward, turning somewhat to the north after it passes East Gate, and ends at Deer Creek. As indicated, it is interconnected with the Mayfield Road drain sewer both in the center of the right of way of the freeway and at the intersection of Mayfield Road and SOM Center Road. The territory from which surface water will drain into the new sewer is wholly within that which has been drained by the

original Mayfield surface water sewer since it was installed more than thirty-seven years ago. Most of the new sewer had been installed before this action was brought, there remaining to be installed only a short segment east of SOM Center Road. The evidence is to the effect that the size of the new sewer was dictated by the City of Mayfield Heights in giving its consent to the construction of the freeway through the city and that the size was dictated by what might be required because of future development. It is also perfectly clear that whatever part of the capacity of the new sewer estimated as one-half after heavy rains is needed by the Village of Mayfield Heights, its purpose was to take care of the growing inadequacy of the present drain sewer in Mayfield Road in the immediate area of the new freeway. The construction of the freeway including the necessary sewers through Mayfield Heights has been a matter of public concern and of public notoriety for over two years prior to the time that the construction started.

Moreover, as a part of the surface drainage sewer plan for the territory here in question, a sewer was constructed in Orchard Park Boulevard and connected with the Mayfield sewer, the flow of which was north from Mayfield Road to Wilson Mills Creek. The size of the Mayfield sewer as it enters this intersection of Mayfield Road with Orchard Park Boulevard is forty-two inches. The plan shows at this point a "42 stub Blkd" branches off into Orchard Park. Proceeding east from this connection the size of the Mayfield sewer is reduced to a diameter of twenty-seven inches. The reduction in size cannot be explained by an increase of the degree of slope said to be a factor in determining the size of a drain sewer as is shown by the constant changes in the size of the Mayfield sewer from Lander Road to Deer Creek. Here the degree of slope on both sides of this change of the size of the sewer was three tenths per cent. By reason of the location of the Orchard Park branch of the Mayfield sewer system, which is located near the easterly boundary of the Wilson Mills Watershed, the amount of diversion of drain water from the Wilson Mills Watershed must have been greatly reduced. One of the defendants' expert witnesses testified that it would be impossible to determine the amount of surface water that would thus be emptied from the Mayfield sewer into Wilson Mills Creek.

The record shows that the acreage of that part of the three watersheds lying south of Mayfield Road between Lander on the west and Deer Creek, the eastern boundary of the watershed, was five hundred seventy acres. The evidence also shows that the percentage of rain water that drains off this territory in a rain storm is thirty-nine hundredths per cent, and that in the event of a storm of sufficient intensity as to result in one inch of rainfall per hour, the runoff of that part of the watershed south of Mayfield would be three hundred forty-eight cubic feet per second. The three drain sewers now emptying into Deer Creek at or near the Mayfield culvert, that is, the sixty inch sewer through East Gate, the forty-eight inch sewer in Mayfield and the fifty-four inch oval sewer just constructed to pick up the head waters of Deer Creek south of the Mayfield culvert and east and in part west of SOM Center Road, if running at full capacity, would discharge five hundred sixty-eight cubic feet of water per second. Without the fifty-four inch oval sewer, which is entirely within the Deer Creek watershed, the total capacity of the forty-eight inch and sixty inch sewers running full would be two hundred seventy-eight cubic feet per second. The capacity of Deer Creek is in complete dispute, plaintiffs' expert testifying that it was two hundred fifty cubic feet per second while defendants' expert estimated its capacity as six hundred six cubic feet per second. Just how there could be such a difference resulting from engineering computations of physical facts is hard to comprehend. But when the plaintiffs' evidence does not show a dangerous or damaging flood since the "Fifty Year" storm of June, 1959, when the rainfall was three and nine tenths inches per hour, although the rain chart shows that from August 3, 1960, until August 21, 1961, there were ten storms, the most severe of which was on August 21, 1961, lasting ninety-eight minutes, in which the rainfall was at the rate of one inch per hour, the dangers alleged because of the construction of the seventy-two inch sewer seem to be without foundation. This is especially true when considered with the fact that this new sewer is designed to drain surface waters only within a part of the territory now drained by the existing Mayfield sewer. There was one storm on July 30, 1961, when the rainfall was at the rate of two and four tenths inches per hour but its duration was only fifteen minutes.

The fact that the drainoff will be three hundred forty-eight cubic feet per second (which must be reduced by the amount of discharge into the Orchard Park branch) while the sewer capacity at maximum flow is two hundred seventy-eight cubic feet per second only demonstrates the need for the relief to be provided by the seventy-two inch sewer. However, it is not demonstrated by the record that under ordinary circumstances anything less than a "Ten Year" storm will exceed the capacity of Deer Creek.

The Plaintiffs spent considerable time in trying to demonstrate that because of the topography of Mayfield Road the statement made by one of defendants' experts that where the rate of rainfall exceeds the sewer capacity surface water would flow overland to Deer Creek was incorrect since it was physically impossible. The evidence of plaintiffs' engineer shows that between Golden Gate Boulevard, which runs north from Mayfield Road directly across from the east side of Golden Gate Shopping Center, at the north curb or gutter the geographic level is one thousand seventy-two feet above sea level while to the west of this point, some two hundred feet, such level is one thousand sixty-nine and seventy-five hundredths feet, making a valley of twenty-four and one-half inches at the lowest point. Farther to the west, Mayfield Road rises to a point nine feet above the low point at Lander Road. The evidence of this witness is also to the effect that the sidewalk level to the north of the low point is ten inches above the curb and that the curb is four inches high. While it is clearly evident that water could not flow east up the hill and would overflow to the north at the low point if rain water were to gather at the low point sufficiently deep to go over the bounds of its confinement, the question is purely academic inasmuch as there is no evidence that there was such flooding over the north sidewalk. The evidence does show, however, that there is considerable gathering of drain water at certain points of the parking area of Golden Gate Shopping Center and at other places which allows the excess water to flow into the sewers as their capacity permits. However, from the trend of the record the purpose of this evidence was to discredit defendants' expert and consideration of it will be confined to that question.

The issues presented are first, whether the City of Mayfield

Heights or the State of Ohio has gained a prescriptive right to discharge whatever surface water is in fact diverted by the present sewer system from the Wilson Mills and Andrews Watershed into Deer Creek. The second issue is, whether the upper riparian owners have the right to increase the periodic flow of drain water caused by rainfall where, by reason of residential and commercial developments within the territory, such collection and discharge of surface water in sewers makes such discharge immediate and in considerably larger volume at the time of rain rather than the disposition of surface water through the ground in its natural way and thus to find its way slowly to a common outlet or stream. Two other questions might also need consideration. The first is, whether under the circumstances the plaintiffs have an adequate remedy at law and secondly, whether the plaintiffs, after having permitted large expenditures of public funds in the installation of most of the sewer, can now seek equitable relief to enjoin the completion of it.

Most of the authorities on the establishment of a prescriptive right with respect to water in a stream are concerned with the use of such water rather than that of an upper riparian owner increasing the discharge of surface water into the stream. But when dealing with the subject of a municipal corporation or the state in furnishing drain sewers in the interest of public health and safety where some diversion from one watershed to another results in moderate degree, the authorities, although not unanimous, support the proposition that where such diversion has continued in open and notorious fashion for the period of time by which a prescriptive right is obtained and where the sewers have been authorized by acts of public authority spread upon the records, a prescriptive right to continue such seasonable diversion is gained even though some detriment may fall upon lower riparian owners. This theory was supported by the case of *Foot* v. *Bauman*, 333 Mass., 214, 129 N. E. (2d), 916, where the controversy was between private citizens and not public authority.

Our conclusion on this question is that the County of Cuyahoga (its sanitation division having planned and installed the sewers here concerned in 1925), a branch of the state government, and the City of Mayfield Heights, have gained a prescrip-

tive right to continue to use the Mayfield Road drain sewer in Mayfield Road from Lander Road to Deer Creek together with the right to make whatever improvements are found necessary to meet increased flow because of the development of the area and the public improvements made in the interest of the public even though there may have been and there will continue to be some diversion of drain water from the Wilson Mills and Andrews Watersheds. Certainly, after a thirty-seven year period of continuous, open and notorious operation of a surface drain sewer, which in order to drain the area that has been thus served requires enlargement, made necessary by the residential and commercial development and necessary public improvements in the territory, such lower riparian owners below that of the city where the stream originates and into which stream the drain sewer has thus been permitted to flow cannot enjoin the installation of such necessary enlargement of such public facility. This conclusion is supported by this court in the case of *Oakwod Club* v. *City of South Euclid*, 83 Ohio Law Abs., 153, 165 N. E. (2d), 699, where it was held that without a prescriptive right due to the passing of time a lower riparian owner could not complain of moderate diversion from other watersheds by city sewers and such moderate diversion could not be enjoined. On page 702 of the Northeastern (Second) Report, the court said:

"We, therefore say, in the instant case, that: where a watercourse exists on the land of an upper proprietor, he may collect the surface water arising on his land into sewers or drains, and discharge it into such watercourse without liability to the lower owner; so also a municipality may collect, into sewers, the surface water which comes from a watershed area within its borders, and discharge it into such watercourse, without liability to the lower owner, even though in so doing incidental damage may occur to the lower proprietor."

We also conclude that the increase of the flow of drain water into Deer Creek that may result from the enlargement of the capacity of the present sewer within its drainage area to supplement its inadequate capacity because of the residential and commercial growth of the area served does not create in the plaintiffs a legal or equitable right to enjoin the construction of such supplemental sewer. A community has a right to grow

and in the process to protect its citizens against the harm of flooding drain water. Associated with this right is the reasonable use of natural watercourses through which drain water may be discharged by an upper riparian owner without being subject to liability for the increase in flow to lower riparian owners.

In the case of *City of Hamilton* v. *Ashbrook,* 62 Ohio St., 511, 57 N. E., 239, the Supreme Court of Ohio said in the first paragraph of the syllabus:

"A municipal corporation is not liable for damages caused by such increased flow in a natural water course as results from the improvement of lots and streets within the territory whose waters naturally drain into such water course. (*Springfield* v. *Spence,* 39 Ohio St., 665, followed and approved.)"

Also, in *Mason* v. *Commissioners of Fulton County,* 80 Ohio St., 151, 88 N. E., 401, the court said in the syllabus:

"A landowner may, in the reasonable use of his land, drain the surface water from it into its natural outlet, a watercourse, upon his own land, and thus increase the volume and accelerate the flow of water without incurring liability for damages to owners of lower lands; and his land is not subject to assessment for the cost of a ditch, or an improvement, that will not benefit its drainage but is constructed to prevent overflow from the watercourse or to benefit the drainage of servient lands."

See also, *Nagy* v. *City of Akron,* 27 Ohio App., 250, 161 N. E., 226; *Oakwood Club* v. *City of South Euclid, supra.*

Thus, it must be concluded that the plaintiffs, if any damages are sustained from any wrongful act of the defendants, have an adequate remedy at law and cannot avail themselves of the remedy of injunction to enjoin the construction of a necessary part of an important public improvement on the state of the record in this case and the facts found as herein stated.

Holding these views, it is not necessary to consider the question of laches or the jurisdiction of the Court over the Highway Director.

Decree for defendants. Exceptions. Order see journal.

Kovachy, P. J., and Hurd, J., concur.