GRIGGER *v.* CITY OF NORTH ROYALTON.

(No. 895610—Decided May 23, 1977.)

Court of Common Pleas of Cuyahoga County.

*Mr. Lynn W. Leary,* for defendant.
*Mr. Otto W. Schultz,* for plaintiff.

LAWTHER, J.  Plaintiff lives on the north side of Albion Road in North Royalton, an east-west street, and seeks to enjoin the city from collecting and discharging surface drainage across his property. He alleges damages due to the depreciated value of his property, destroyed personal property, and attorney fees.

Testimony was presented by plaintiff, and by the mayor and the city engineer of North Royalton. The physical facts are not in dispute. There is no storm sewer system in the vicinity of Albion Road. There are drainage ditches on both sides of the road, which drain into three

other ditches in the general vicinity of plaintiff's home. These then carry the overflow in a northerly direction until the drainage ultimately reaches Baldwin Creek. The middle ditch of these three is located on plaintiff's land near his western boundary line. It is fed by an eighteen-inch concrete culvert which lies under the road and connects the south roadside ditch to the north, by means of manholes on each side of the road, and then extends into plaintiff's property about four feet.

The evidence indicated that the original culvert was constructed in 1918 and was replaced in 1946 by the Cuyahoga County Engineer. Albion Road is maintained by the county, as are the ditches on both sides of the road, through agreement with the city. There was no evidence, however (and a court search of county records discloses none), of any attempt by the county or the city to acquire any rights by easement or condemnation proceedings, or by the procedure provided for construction of county ditches in R. C. Chapter 6131 to use plaintiff's land as the repository of surface water collected in Albion Road ditches and channeled thereon by the concrete culvert. At the end of the culvert, a ditch approximately one foot deep now receives the overflow drainage and extends north across 800 feet of plaintiff's land becoming more shallow and less defined as it does so. The evidence disclosed, and a personal visit by the court verified the fact, that the ditch is filled with debris, weeds, cattails, small trees, and other matter which clogs and impedes whatever flow pattern may have existed at one time. Actual flow takes place only at times of rainfall.

Plaintiff testified that he built his home on the land in 1960; that he was aware of the ditch when he did so, but that no difficulty was encountered until the city installed sanitary sewers in the late 1960's, and in 1968 permitted a property owner on the south side of the road to install an inadequate twelve-inch drain tile in the road side ditch in front of his home and to fill in the area above it for parking purposes. Plaintiff stated that this action effectively blocked proper flow of drainage on the south side and in-

creased the flow through the culvert and onto plaintiff's land.

Since 1968, plaintiff complains of numerous floods caused by the overflow of the ditch in the area of his backyard, and states that such flooding occurs at any time rainfall amounts to 1/2 inch or more. Photographs introduced into evidence demonstrate plaintiff's claim that such floods cover almost the entire rear portion of his yard to a depth of several inches. He further states that this water then finds its way into his basement resulting in flooding there to a depth of as much as one foot; that this condition has destroyed books, woodwork, furniture, floor tile, appliances, etc., and so overworked his sump pump that it had to be replaced. Plaintiff testified as to his estimated value of the property destroyed, but presented no verification as to actual costs incurred.

He further testified that the city has never cleaned the ditch, although he has complained about the intolerable conditions on numerous occasions; that he tried to clean it himself at first, but decided that if the city was unwilling to help clean an 800 foot ditch, that he was unable to do so alone.

In 1970, plaintiff attempted to alleviate the problem by installing a metal plate at the end of the culvert to block the drainage emptying on his land. He then received a letter from the city ordering him to remove the plate or face arrest under Ordinance No. 2606 which states:

"* * * no person shall, except as provided in Section 3 hereof, obstruct, impede, divert, enclose, or vary the location, direction, size or capacity of any drain, ditch, drainage ditch, culvert, sewer, natural watercourse or other watercourse, depression or conduit for the drainage of water situated within the Municipality of North Royalton * * *."

Plaintiff then removed the metal plate and filed action for relief.

Paul Frank, city engineer, testified that he did not know who created the ditch originally, and that it is a "private ditch." When asked why the private property owner should bear such a burden, he testified: "that's the

only place the storm water can go at the present time." He further stated that he had recommended in 1970 that the city undertake cleaning of the ditch, or seek easements to maintain the ditch or build a sewer. Neither was ever done, but the city and county did cooperate on cleaning and maintaining a similar ditch lying to the east of plaintiff's. No evidence was presented as to why these two ditches were not considered alike and cleaned at the same time. The engineer also stated that installation of a 21 inch pipe to replace the ditch would cost $20 to $25 per foot.

The mayor testified that all Albion Road flooding complaints are directed to the county engineer, and that the city does need a plan for storm water drainage; that eventually, Albion Road will have storm sewers. He also stated that he would like to enter plaintiff's property and "clean the ditch under state law, charging the cost to property owners". No reason was given for expecting plaintiff to bear such costs of public drainage flowing through his land and originating in the roadside ditches on Albion Road.

Furthermore, no reason was given for the city's failure to take some action to eliminate this problem by acquiring an easement across plaintiff's land, installing a sewer, or petitioning the county to construct a drainage ditch in accordance with R. C. Chapter 6131. The city's position appears to be that plaintiff is the victim of unfortunate circumstances which the city is unwilling to alleviate, and which the city prohibits the plaintiff from solving due to a prohibitive ordinance.

The leading Ohio case concerning the obligations of a servient landowner, with respect to surface water, is *Mason v. Commrs. of Fulton County* (1909), 80 Ohio St. 151. The syllabus of that case holds:

"A landowner may, in the reasonable use of his land, drain the surface water from it into its natural outlet, a watercourse, upon his own land, and thus increase the volume and accelerate the flow of water without incurring liability for damages to owners of lower lands; and his land is not subject to assessment for the cost of a ditch, or an improvement, that will not benefit its drainage but is con-

structed to prevent overflow from the watercourse or to benefit the drainage of servient lands."

This case and the many which have cited it through the years all contain similar holdings relative to the drainage of surface water into *natural outlets* or *water courses*, but do not appear to deal specifically with the questions raised in the instant case.

On page 159, in the opinion, however, an interesting comment is made:

"It is well settled under the rule of both the common and the civil law that *surface water cannot be collected into a ditch and discharged upon the land of another, to his damage;* but the landowner may, in the reasonable use of his land, drain the water from it into its natural outlet, whether that be a watercourse or a natural drainage channel, and thus increase the volume and accelerate the flow of water of such watercourse or channel, without incurring liability for damages to owners of lower lands." (Emphasis supplied.)

Defendant relies upon cases which cite the *Mason* case, all with fact situations similar to it. In *Oakwood Club* v. *South Euclid* (1960), 165 N. E. 2d 699, the Cuyahoga County Court of Appeals held that the city was not liable for damages caused by increased flow in a natural watercourse, a stream which flows through Oakwood Country Club, although the city discharges storm water into the stream which may result in flooding when the stream overflows its banks. A similar decision in *Munn* v. *Horvitz Company* (1964), 175 Ohio St. 521, followed the *Mason* case in holding that an up-stream municipality may collect surface water in sewers and channel it into *natural water courses,* which, in this particular case, was a stream known as Deer Creek, even though such act increases the flow to the detriment of down-stream landowners. These cases are easily distinguished from the case at bar, however where no stream or natural watercourse flows through plaintiff's land, but where instead a part-time drainage ditch has been created, *originating on plaintiff's land,* through the discharge of public sewerage on plaintiff's

front yard from an 18 inch pipe. No representation was made in this case that the ditch on plaintiff's land amounts to a natural watercourse or stream flowing *through* his property.

Defendant also cites recent cases from the Cuyahoga County Common Pleas Court which have no application to the case at bar. In *Broadview Heights* v. *North Royalton*, case No. 76-957401, and in *Brookpark* v. *Middleburgh Heights,* case No. 76-959052, plaintiff cities attempted to enjoin new construction in neighboring communities lying on higher ground due to fears that such new developments would generate additional drainage problems for the communities situated in lower areas. In both of these cases, however, the court properly held that no injunction would lie because of the duty of servient property to accept drainage from dominant estates. Of far greater importance, however, is the fact that in both cases, all municipalities were properly equipped with storm sewer systems designed to carry off surface drainage, and the dispute arose over the duty of one city's storm sewer to accept water from the storm sewer of another.

The basic question presented in the case at bar is whether a municipality can fulfill its obligations to provide storm water in public ditches and discharging it onto private property, without having obtained a right to do so through the use of easements, eminent domain, or the construction of storm sewers. Several Ohio cases provide justification for deciding this question in the negative.

The case of *Butler* v. *Peck* (1865), 16 Ohio St. 334, held that the upper landowner cannot collect water in a channel and discharge it in a mass on the land of his neighbor.

The third headnote of *Strohm* v. *Molter* (1939), 30 Ohio Law. Abs. 330 reads as follows:

"Between adjacent landowners, the owner above has no right to in any way change a natural water course or to concentrate the surface water upon his premises into a small channel and precipitate such water upon the lower adjacent property."

In *McCoy* v. *Rankin* (1941), 42 N. E. 2d 234, the following headnotes appear:

"3. The extent of the servitude which a lower tenement owes to a higher tenement to receive water naturally running from the higher tenement is limited to surface waters that naturally find their way over the subservient estate, and it cannot be artificially changed to the damage of the subservient estate."

"7. The owner of land cannot so control the flow of water from his higher land as to impose a greater burden on lower land than a burden which arises from the contour of the land."

"9. Owner of higher land had no right to enjoin owner of lower land from maintaining a dam across water course, so as to cause water to back up on land of owner of higher land, if the owner of the higher land had so built tile drains as to cast an undue burden on the owner of the lower land."

The dominant owner in the *McCoy* case sued the servient owner to enjoin him from building a dam to block the natural flow of surface water. Although the plaintiff prevailed on the grounds of established Ohio law, as applied to those facts, the court's comments in the above headnotes appear applicable to the instant case. It should also be noted that in the *McCoy* case the "natural water course or channel" was the *Ford County Ditch* constructed by the county commissioners in accordance with Ohio law using, in part, 15 inch drain tile. This procedure is still available in R. C. Chapter 6131, but is used primarily in rural counties to provide natural drainage. Where this is done, the county commissioners are empowered to construct and maintain public drainage ditches when requested to do so by the petition of landowners affected thereby.

The court in the instant case considered the possibility that plaintiff's ditch may have become a public ditch, by virtue of R. C. 6131.59 which reads:

"When an improvement consisting of a ditch, drain, or watercourse has become the outlet of agricultural drainage, and has been established and constructed, or used,

for seven years or more, it shall be deemed to be a public watercourse notwithstanding error, defect, or irregularity in the location, establishment, or construction thereof * * *,"

A recent Ohio Supreme Court case disposes of this possibility, however, and appears to have considerable relevance to the instant case. In *Caldwell* v. *Goldberg* (1975), 43 Ohio St. 2d 48, the court held in the first paragraph of the syllabus:

"A drainage ditch located on private property does not become a public watercourse by reason of R. C. 6131.-59 unless it was established or improved pursuant to provisions of R. C. Chapter 6131."

The opinion also contains the following interesting observations at page 50:

"Although the ditch in question has been an outlet of agricultural drainage for more than seven years, it was not established by action of the county commissioners pursurant to the provisions of R. C. Chapter 6131, nor was it dedicated to public use by appellees. We agree with appellees and the Court of Appeals that R. C. 6131.59 must be read to operate in conjunction with the entire chapter, so that the ditch, built by appellees with some federal aid, remains a private ditch.

"Appellants argue that the ditch is a public watercourse because it follows the path of natural drainage of the land. However, evidence adduced at trial showed that surface water in the area was intermittent * * *. Diffuse and intermittent flow of water over lowlands does not qualify as a public watercourse without more evidence of a stream bed or watercourse of some sort."

As in the *Caldwell* case, the ditch in this case carries intermittent surface water, and from the court's observation can under no stretch of the imagination qualify as a stream bed or watercourse.

The record is silent as to why no action has been taken by the city to alleviate the problem on Albion Road, but it may be assumed that like all sewer projects, funding represents a major difficulty. The court feels, however, that

the city's attitude toward the problem shows basic lack of concern, and that its expectation that plaintiff should continue to accept public drainage which regularly floods his backyard and basement because "that's the only place the water can go" is unconscionable.

The city's attempt to escape responsibility on the grounds that Albion Road is maintained by the county cannot be supported by virtue of the city's inherent responsibility to provide proper systems of drainage within its borders. Whether or not the county would participate in such projects is simply a matter of contract and negotiation between the two governmental entities. The city cannot, moreover, prevent plaintiff from protecting his property from the excess water in a public drainage ditch, by ordinance, and then disclaim all responsibility for the situation and its solution.

Considering all of the facts and testimony adduced at the hearing and the applicable law as set forth above, the court concludes that the plaintiff is entitled to some measure of relief as follows:

1. The court finds that North Royalton Ordinance No. 2606 is unreasonable, unenforceable and invalid with respect to its possible application to plaintiff's land, and defendant, city of North Royalton, is hereby enjoined from enforcing this ordinance against the plaintiff in so far as such drainage ditch is concerned and from prosecuting plaintiff for violation of same, either for past actions or future measures which plaintiff may deem reasonable to block the flow of public drainage on to his property.

2. The court hereby enjoins the city of North Royalton from collecting and discharging public drainage water onto plaintiff's land and orders that within one year from date of this order, the city shall have completed suitable substitute drainage facilities through the construction of a public sewer, through an appropriation of a portion of plaintiff's land for proper construction of a public drainage ditch or other appropriate means consistent with modern standards of engineering and construction.

Although plaintiff did testify as to numerous items of

damage which he claims to have suffered as a result of flooding on his land, such testimony was far too speculative for the award of damages and the evidence failed to justify a finding that the city of North Royalton was in fact responsible for whatever flooding damage plaintiff may have sustained.

Plaintiff has also prayed for attorney fees, and while the court is sympathetic to that request, in view of the city's failure to rectify the problem, thus forcing the plaintiff to file legal proceedings, the established law appears to preclude attorney fees in the absence of a finding of willful and wanton misconduct on the part of defendant, which would permit punitive or exemplary damages. Since the evidence does support such a finding in this case, the prayer for attorney fees must be denied. See *Alyeska Pipeline Service* v. *Wilderness Society* (1975), 421 U. S. 240; *State, ex rel. Fraternal Order of Police,* v. *Dayton* (1977), 49 Ohio St. 2d 219; and *New York, Chicago & St. Louis Rd. Co.* v. *Grodek* (1933), 127 Ohio St. 22.

*Judgment accordingly.*