### JOHNSON, Plaintiff, v. GOODVIEW HOMES-1, INC., Defendant.

Common Pleas Court, Summit County.

No. 213978. Decided January 12, 1960.

Duane Morris of Buckingham, Doolittle & Burroughs, Akron, for plaintiff.

Richard Sternberg, Akron, for defendant.

## OPINION

By WATTERS, J.

In the case at bar, the plaintiff, Johnson's land fronts on the east side of Superior Avenue in the City of Akron, and abuts on the rear on the west side near the northwest corner of the property of the defendant corporation, **and lies lower in grade than the defendant's** (Goodview Homes-1) **property.**

Plaintiff's property has a house on it, which they have occupied several years before the defendant purchased and improved their land to the east in 1957.

Plaintiff's property, as said before, lies lower than defendant's, and is graded so that it **slopes downward** from the west line of defendant's property west to Superior Avenue. There is a concrete driveway on the north side of plaintiff's property, and between the drive and the house plaintiff has constructed a patio of fire brick material in squares of about one-foot square. There is no garage.

In 1957 the defendant purchased their tract of land to the east of plaintiff's land, which was then and after improved much higher generally than that of plaintiff.

This tract lies and abuts partly on the north side of Wooster Road or Wooster Avenue extension, excepting the Mallison property, in the

City of Akron. (See Defendant's Exhibit B which is an enlarged photograph of the rough drawing upon the blackboard which counsel used and referred to all through the trial, which does not purport to be drawn to scale.)

The defendant's lands are considerably lower in grade than Wooster Avenue extension, and were before any improvement was done thereon.

At one time the City of Akron owned this tract and used it for some sort of pumping station. When the City sold the tract of Guattrochi, it reserved the land marked on said tract and exhibit as "Harmon Avenue" running some 314 feet north from Wooster Avenue to the north line of said tract of the defendant's where it merges with Harmon Avenue as it then and previously had existed, as an unimproved city street running to Leonard Avenue to the north; so the City actually owns Harmon Avenue as shown on the exhibit-photo.

When the defendant company purchased and improved the tract from Guattrochi, excepting that owned by the City aforesaid, the City graded and put in the base of the part thereof known as "Harmon Avenue" to a width of its said land owned by it, to-wit, 24 feet, and the defendant company paved it with what is known as black top or asphalt. Said strip is highest at Wooster Avenue and slopes to the north at a gradual grade to the north line of defendant's tract. No curbs or gutters or storm sewers were installed, but a sanitary sewer was installed.

Wooster Avenue, where it passes defendant's tract of land, slopes sharply from some distance east of said tract down hill to the west towards the Hawkins Avenue intersection with Wooster.

Before building twelve one-story two-family apartments (or double homes), six on either side of said Harmon Avenue, the defendant company graded the remainder of its land on either side of said Harmon Avenue, generally filling in the low portions and grading down the higher portions. At the commencement thereof the land was generally very rough and overgrown with underbrush, weeds, etc., and irregular in contour, and consisting of many high lands and depressions throughout the surface thereof.

When Guattrochi occupied it for many years, he had cultivated much of the land, but for several years before 1957, when the defendant company purchased it, he had abandoned cultivation and raised chickens and the land became overgrown as aforesaid.

Originally, the land along the westerly side of defendant's tract was considerably higher than plaintiff's land and others lying to the west of defendant's west line. This high land extended to the east for some short distance where it suddenly dropped off, forming a rather deep gully, running from the southerly or Wooster Avenue side of the property north along the westerly side of said property to the north line thereof.

This gully, in its natural state, would retard surface water naturally flowing from the east to the west, which defendant claims was the natural drainage on its lands before and after its grading thereof. However, in bulldozing and grading its land, cut down the higher land between the said gully and plaintiff's land and filled said gully, thus

eliminating the protection of the gully and causing more water to flow upon plaintiff's land.

The construction of the said Harmon Avenue, hard surfaced with asphalt, with no curbs or gutters or storm sewers, naturally increased the natural flow of surface water towards plaintiff's premises; likewise, the building or constructing of hard-surface parking plots for use of the occupants of the apartments increased the flow of surface water toward plaintiff's premises.

The plaintiffs claimed the natural flow of surface water over the defendant's lands was from the southeast to the northwest, and defendant claims it was from the east to the west and still is.

No expert drainage engineers testified on this point on either side, and it does not make any material difference actually.

To the west of said Harmon Avenue, and east of its six buildings there, the defendant excavated and bulldozed the land in terraces so that water was collected and held in the third or most westerly terrace, blocked by a raise in grade on the westerly side thereof, due to defendant's construction.

Further, defendant caused said water to flow in certain Orangeburg pipes from said lower westerly most terrace underground between several of said apartments, and under the sidewalks of said apartments, on the west side of said Harmon Avenue, at and towards and upon plaintiff's premises.

There is no question in the court's mind, from the evidence, that defendant has generally increased, diverted, and accelerated the flow of surface water toward and upon plaintiff's property.

Furthermore, none of the down spouts from the apartments were connected at the lower end to any storm sewer or pipe which would carry the water away. When the case started, there were no gutters or down spouts on the apartments at all. As a matter of fact, all of said down spouts ended at the lower end thereof, about six inches from the surface of the ground, and spilled out over a hole dug thereunder and filled with gravel, which would eventually allow said down spout water from all apartments to become surface water through seepage through the soil on the down grade toward plaintiff's premises.

This is not too important, as to those apartments to the east of Harmon Avenue, but of considerable importance in directly increasing the flow toward plaintiff's premises from the six apartments to the west of Harmon Avenue, the rears of which apartments are a short distance from the east property line of plaintiff's and defendant's west line, from which apartments directly behind plaintiff's premises the land slopes down towards plaintiff's house.

The entire situation is mitigated some by the fact that there is no evidence that plaintiff's cellar walls are cemeted or tarred on the outside surface, nor any evidence that plaintiff has any drain tile at the bottom of his cellar walls, which are of concrete blocks; furthermore, plaintiff's land does slope from the rear of his lot west toward his house, and down his driveway to Superior Avenue upon which he fronts.

The roof area of all the apartments coming down collectively through the down spouts would certainly accelerate the flow over and above

the flow naturally, which would otherwise tend to seep in gradually over the area. The square foot roof surface of each apartment is admittedly 1,008 square feet or 12,000 for all six at this location.

The total paved parking areas are 8,000 square feet. The drive or Harmon Avenue is 7500 square feet.

The total land area is about 68,000 square feet including the drive or Harmon Avenue, so above one-third of the area is covered with impervious material, not including the sidewalks.

These facts appear in the answers to the interrogatories by defendant company.

**In addition, the defendant has,** by grading and filling, changed the contour in various places, thus diverting and accelerating the surface water flow, and trespassed upon the land of plaintiff, thereby proximately causing damage to plaintiff's house, to various personal property in the basement, loss of full use of said basement through wet and dampness and the like.

The plaintiff banked the land to some extent around his east cellar wall on the exterior thereof, and has placed a metal water repellant back up around the east cellar window on the outside. He claims that one time in 1958 water came over this and poured through the closed cellar window into the basement (see movie in evidence), and that at other times after heavy rains water has seeped into his basement to a considerable degree, making the cellar damp and wet, and unusable for long periods of time, and damaging said walls by causing cracks therein, especially along the east cellar wall, being the rear cellar wall of plaintiff's house.

Said cracks are hairlike in width, running horizontally across said wall, in the mortar between the blocks.

There is no evidence that the wall or the blocks are out of line, or that the wall or any of the blocks have sagged inward due to water pressure from without. However, said cracks allow water to seep through said east wall.

### THE LAW APPLICABLE

There are two rules in Ohio regarding surface water as regards the upper or higher estate, and the lower or "servient" estate, of adjoining land owners.

The so-called **rural or civil rule,** that is outside of a municipality or village, is that the lower estate, that is, the land adjoining, lower in grade, is bound to accept the **natural surface waters** flowing from the so-called upper, or higher, in grade, estate, and there is no liability, therefore, upon the part of the upper owner.

There are many exceptions to this rule, which the court will not here discuss.

**This, however, is not the rule where the properties, as here concerned, lie within a municipality or village. In such case the so-called urban rule applies.**

See **95 Oh Ap 383 (1953), Lunsford v. Stewart,** and **102 Oh Ap 324 (1956), Keiser v. Mann** (motion to certify dismissed 2/20/57, **166 Oh St 190**).

**Under this so-called urban rule,** the said cases above hold that the

lower adjoining owner is not bound to accept the natural surface water flowing from the higher estate, and there is no liability upon the **lower owner,** if he raises the grade or level of his property, **in a reasonable manner,** even though in so doing he dams up, or obstructs, the natural flow of surface water, from the upper estate, and causes the surface water to back up and stand upon the upper or higher estate, where formerly it had flowed therefrom across the lower estate of the lower adjoining owner.

So under the latter urban rule, the lower adjoining owner, as long as his acts are a reasonable use of his own property, can keep the surface water from the higher property off his property, as long as he acts in a reasonable manner.

In the Lunsford case, the court held:

"We hold that owner of a city lot, which receives the natural flow of surface water from an adjoining lot, may fill said lot and erect structures thereon, diverting the natural flow of the surface water, and if done in a reasonable manner, no liability exists in favor of the adjoining (upper) owner." ("Upper" added by this court.)

It appears from the above that the plaintiff here could have taken the matter in his own hands, and could have cast said water back upon the defendant's land, and if he did so in a reasonable manner, the defendant company could not complain, or hold the plaintiff liable therefor; however, the plaintiff has other remedies under the law.

In the instant case, the properties involved being within the City of Akron, **the so-called urban rule applies, and not the rural or civil rule** first discussed.

There are some older cases that the court has found, however, where the upper owner, of rural property, may divert the surface water upon his property, or accelerates the flow thereof, from his property, and cast it upon the lower owner, and can escape liability therefor by showing that what he did was done in a reasonable manner, or was a reasonable use of his property. On the other hand, the court believes the general present, modern rule, urban or otherwise, to be that the upper owner commits a trespass if he diverts the flow of the surface water from his upper land, and greatly increases, or accelerates, the flow of surface water from his upper land in other than a natural waterway or channel, and casts the same upon the lower land, even though the manner in which he acts is reasonable. Even then he cannot by his actions increase the flow beyond the capacity of said channel, etc.

**In this case there was no water course, well defined channel, or natural depression,** existing upon the property of the defendant into which the defendant collected the surface waters on its land, by pipes, etc., and cast said waters into such water course, channel, etc., so, therefore, the rule announced by our court of appeals in the first syllabus of the **Bey v. Wright case, 108 Oh Ap 10** (Ohio Bar 8/10/59) which sustained this court, does not apply. Further, that case was of a different nature.

On this subject, see further **Nagy v. Akron, 27 Oh Ap 250 (1927),** on **page 253,** commencing, "a careful examination of the text books and

decisions _____" etc. And also on page 254 it is stated:—(See, "It will be observed ___" etc.)

See also **20 Oh Ap 162, Rueckert v. Sicking,** which was an urban case, the facts of which closely parallel those of the case at bar. "Water flowing on defendant's constructed sidewalk, with a depression to the north of it, plus water from the elevated rear of defendant's lot, was cast upon plaintiff's lot, and water from the downspout of defendant's garage was cast upon plaintiff's lot. Plaintiff sought and was granted an injunction against such."

See also **39 O. Jur. 466, Section II,** where the court discusses the law of the above Rueckert case, and the rule of trespass as established therein, and in **Barberton v. Miksch, 128 Oh St 169,** from this county, involving trespass upon adjoining lands by percolation of waters from the Barberton reservoir, and holding that liability from such trespass for damages proximately resulting therefrom, is **not dependent upon negligence.**

Other cases are cited therein in the footnotes.

See also **"Principles of Water Rights Law in Ohio," printed by the State of Ohio,** Department of Natural Resources, Division of Water, pages 16, 17 and 18, etc., paragraphs 40, 41, 42, 43, 44, 45, 46, 47, etc.

See also **41 O. Jur. 52, Section 51,** as follows:

"A natural water course may be created by the flow of surface water, but the rule is well established in Ohio that the owner of land cannot, by artificial means, divert the natural flow of the surface water off his land, nor can he, by an embankment or otherwise, divert the natural flow of the surface water off the higher land in a manner different from its natural flow onto his land, without liability therefor."

See also the case of **Persin v. Youngstown, 57 Abs 560 (1940),** Mahoning Appeals Court.

This case involved the construction of an airport which diverted and accelerated the surface flow affecting lower owners.

The court said, on page 569 (see below*):

"The law as deduced from these authorities seems to me fairly clear. While mere acceleration of natural flow is not actionable, acceleration plus diversion is actionable.

"There is substantial evidence in this case that the flow of surface water was not only accelerated along the **concrete entranceway to the airport, but that such water was diverted** thereby from flowing into the west highway ditch and was sent across **the top of the highway into** the east lateral and thus overflowed plaintiff's lands.

A very interesting and pertinent case is **Lucas et al, v. County Commissioners of Mahoning County, 167 Oh St 416 (1958).**

The county commissioners bought and improved certain land by building a county garage thereon. The grade and contour of the land was materially changed by grading, fitting and stripping of surface growth, and sloping in such a manner that the surface flow from the land was materially **diverted and accelerated.**

---

*The court was quoting from its earlier case No. 3126, Turowski v. Youngstown, involving the same airport.

This action of increased flow, etc., permanently damaged plaintiff's building, cellar walls and personal goods, etc.

The court held that it was a permanent appropriation **pro tanto** of plaintiff's property, not involving proof of negligence upon the part of the commissioners.

The court held a jury should be impaneled to assess the compensation under the Constitution as an appropriation pro tanto of plaintiff's lands and property, and personal property damage, and sent the case back to the Common Pleas Court for that purpose.

The property here involved was within the City of Youngstown (see second paragraph on page 417).

Of course, there could be no appropriation by the defendant company in the case at bar; however, the case is appropriate and pertinent here as bearing upon the modern view of our courts, and upon the proposition that the question of negligence upon the part of the defendant company is not here involved. This is shown by the syllabus and by the court, and on page 68 of said case as cited also in **5 O. O. 2nd Series, 63,** near top.

"It must be remembered that the present actions are not based upon **either negligence or upon the maxim, 'sic intere tuo ut alienum non laedas,'** which, translated, means, so use your own that you do not injure that of another. They are based solely upon the doctrine of appropriation by encroachment." (Emphasis by this court.)

By "encroachment" it is obvious the court means by "trespass."

As to what the County did, see the facts stated on page 64 of **O. O., 418 of 167 Oh St 416,** in the paragraph commencing, "In the spring of 1954 _____," and the following paragraphs showing diversion, acceleration and trespass.

**Judge Stewart stated:**

"Beginning with the case of **Commissioners of Hamilton County v. Mighels, 7 Oh St 109,** this court has consistently held that a county is not liable for the negligent acts of its officers, in the absence of a statute creating such liability _____."

In view of what we have found above, the question of whether the defendant in the case at bar was or was not negligent in doing what it did in the improvement of its lands is immaterial. Accordingly, it is immaterial for the court to decide or consider whether the defendant was guilty of negligence or negligence per se in failing to comply with Section 1811-1 of the building code of the City of Akron, which entire ordinance is known as number 528-1949, effective November 10, 1949.

The section in question **provides, in substance:**

"Every building shall be provided at all times with proper eave or cornice gutters and metallic downspouts, for conducting all water from the roof into an underground drain to a storm or combination sewer, or to a street gutter if no such sewer is accessible; _____ where it is not possible to dispose of roof water in a manner described above, such water shall be disposed of in a manner approved by the Superintendent of Building Inspection _____."

The defendant claims, through counsel, that it could not comply with said ordinance because it could not pipe the roof water from the

six apartments west of Harmon Avenue to Harmon Avenue, as the said Harmon Avenue is higher than the ground around said apartments, and by the same token he could argue that defendant could not pipe the roof water from the six apartments east of Harmon Avenue uphill to Wooster Avenue. Of course, if he piped it west toward and to Harmon Avenue, it would run across Harmon Avenue, which has no gutters or storm sewer, and down the terraces to the west of Harmon Avenue.

The ordinance provides in case of "impossibility," the Superintendent of Building Inspection can approve some alternative.

Of course, he (the Superintendent) could not approve any procedure which would excuse the defendant from liability for trespassing upon the lands of plaintiff with such excess water.

Whether he did approve the present layout doesn't appear from the evidence, and would be immaterial anyhow.

In any event, the fact remains that the plaintiff is and has been willing to allow defendant to pipe such excess water west through plaintiff's property, presumably down through and under his driveway, to Superior Avenue, for which right plaintiff says he will demand reasonable compensation.

However, as the court has said, the question of negligence or negligence per se is not material.

The court will allow the ordinance in evidence for whatever light it may throw upon the issues before us.

The fact that the court finds the plaintiff is entitled to damages, as will be specifically set forth later, does not prevent the plaintiff's right to an injunction.

See **J. P. Loomis Coal and Supply Company v. Garchev, 123 Oh St 316,** affirming our court of appeals (8 Abs 4), No. 1675. The plaintiff, Garchev, in the case, sought damages and injunction from coal dust enveloping his home from the defendant's tipple. It was a continuing trespass, every time the company dumped coal.

The trial court decided against the plaintiff, Garchev, a jury being waived, as here, in the case at bar. The upper courts decided in plaintiff's favor, that an injunction should be granted and sent the case back for the damage determination.

This case, incidentally, was the last appearance of Mr. Wendell Willkie in our court. He represented the defendant in the trial court only.

In view of the evidence, the court will allow the plaintiff the sum of $500.00 damages.

The defendant company is specifically enjoined from piping the excess water which collects in the most westerly depression at the lowest level of the three terraces, toward and upon plaintiff's property, and from allowing the water from the roof downspouts of the six most westerly apartments to drain upon plaintiff's premises.

A journal entry will be prepared accordingly by counsel with exceptions to both parties.