Myotte, Appellee, *v.* Village of Mayfield, Appellant.

(No. 36444—Decided November 23, 1977.)

Mr. *Earl T. Longley*, for appellee.
Mr. *Ron Tonidandel*, for appellant.

STILLMAN, J. Plaintiff-appellee, Dolores Myotte, owns a single-family dwelling located on two acres of land at 596 SOM Center Road, Mayfield Village, Ohio. Mrs. Myotte purchased her home in 1959, and has lived there continuously until the present time. Mrs. Myotte's property is situated on the west side of SOM Center Road at the northeast end of a watershed which drains from a southwesterly to a northeasterly direction. At the northeast corner of the watershed, the watercourse therein runs through the rear portion of Dickson's property, east along the property lines of the Dickson and Myotte properties, north through the Myotte property, then through the Palermo property, and finally, it turns and flows in an easterly direction underneath SOM Center Road. The location of the watercourse on the Dickson property was changed in the 1940's by the builder of the house, who moved the ditch to the west so that it would be farther away from the house. Similarly, when the Myotte house was built, the builder changed the location of the watercourse so that it would run parallel with SOM Center Road.

The Dickson, Myotte and Palermo properties did experience flooding during very heavy rains even prior to 1969. However, in 1969, an industrial park known as Mount Vernon Industrial Park was developed just south of the Myotte property, and thereafter, all three properties regularly suffered from substantial flooding whenever it rained at all. Development of this park involved the building of a road named Beta Drive which continued through the park and was subsequently accepted and dedicated by Mayfield Village. In addition to the roadway, formerly wooded and grassy areas were supplanted by buildings and parking lots, thereby reducing the land space which would ordinarily serve to absorb surface water. The industrial park occupies a large part of the watershed described previously, but in the course of its development, a portion of the natural watercourse was filled over and replaced by a system of storm sewers originally 48 inches wide and later expanded with an additional 42 inch pipe. The water in this sewer system reenters the preexisting watercourse at the

northerly border of the industrial park property, and then the flow continues in a northerly and northeasterly direction through two lots owned by a Mr. Russo, through the Dickson property and then along the front of the Myotte and Palermo properties, parallel with SOM Center Road. More specifically, the watercourse enters Mrs. Myotte's property at the southwest corner thereof, flows easterly along the southern boundary, and then turns north and flows parallel to SOM Center Road. The ditch or watercourse on the Myotte property is four to six feet wide and three to four feet deep. At the point at which the watercourse flows in the front of Mrs. Myotte's property, it is directed under a concrete bridge through a 27 inch culvert pipe.

The village of Mayfield advised Mrs. Myotte in 1970 that the 27 inch pipe blocked the natural flow of water and that it should be replaced by a larger pipe in order to prevent flooding. Mrs. Myotte did not reconstruct the bridge and pipe to the village's specifications, but rather, instituted the instant action against the village. On August 23, 1974, Mrs. Myotte filed a complaint in which she prayed alternatively either for the court to permanently enjoin the village's building commissioner from issuing building permits for further construction in the industrial park and for damages for past and future trespass and appropriation of her property, or, for an adequate storm sewer system and for compensatory damages. On November 13, 1974, the village of Mayfield filed its answer to the complaint, which denied liability for the flooding, claimed that the village took positive steps to relieve the flooding, and alleged that Mrs. Myotte's 27 inch culvert was the true cause of the flooding in the first place. Trial was had on April 9, 1976. At the close of plaintiff's evidence, and again at the close of all of the evidence, defendant village moved for judgment in its favor, but the motion was twice denied. The trial court found that the village of Mayfield was liable for the damage caused to Mrs. Myotte's bridge, culvert, driveway and basement by the increased flow and volume of water through the watercourse on the Myotte property. The court below

awarded Mrs. Myotte $8,000 damages and enjoined the village of Mayfield from issuing any more building permits for the industrial park complex.

The village of Mayfield filed its notice of appeal on May 7, 1976, and the same was amended pursuant to a motion on August 19, 1977. In its appeal, the village assigned three errors:

"*Assignment of Error I.*

"The trial court erred in overruling defendant-appellant's Motion for Judgment at the close of plaintiff-appellee's case.

"*Assignment of Error II.*

"The trial court erred in overruling defendant-appellant's Motion for Judgment at the close of all evidence.

"*Assignment of Error III.*

"The trial court erred in granting judgment for plaintiff-appellee in any amount and in enjoining the Village of Mayfield from issuance of further building permits."

All three assignments of error basically state the same objection, that is, that the decision of the trial court was erroneous and clearly contrary to law. We determine that the rule of reasonable use applies in this case and that Mrs. Myotte is entitled to judgment as a matter of law.

Traditionally, the lower riparian owner is obliged by law to accept the surface water flowing from an upper riparian property. (*See* dicta in *Johnston* v. *Miller* [1968], 15 Ohio App. 2d 233, 237; *Ratcliffe* v. *Indian Hill Acres, Inc.* [1952], 93 Ohio App. 231, 237.) American surface water drainage law can be reduced to four distinct categories: the common enemy rule, the civil law rule, a reasonable use modification of the civil law rule, and a reasonable use rule. Fry, *From Good Husbandry to Reasonable Use: Illinois Surface Water Drainage Law Evolves in Subdivision Case,* 52 Chi.-Kent L. Rev. 169, 170 (1975-1976). An additional category to those already mentioned is the capacity of the stream rule, which is another variation of the civil law rule. (*See* Annotation, 28 A. L. R. 1262, 1267-1270.)

Under the original common enemy doctrine, a possessor of land has an unrestricted legal privilege to deal with the

surface water on his land as he chooses, without regard to the harm which he may cause to the property of another. Over the years, the common enemy rule has been modified so that a landowner may not maliciously or negligently obstruct the flow of surface water to the detriment of a neighboring landowner. Maloney and Plager, *Diffused Surface water: Scourge or Bounty?* 8 Nat. Resources J. 72, 79 (1968).

The civil law or natural flow doctrine allows a landowner to improve his land despite consequent injury to another landowner so long as the natural watercourse is not altered in any way by the offending landowner. *Oakwood Club* v. *South Euclid* (1960), 83 Ohio Law Abs. 153; *McCoy* v. *Rankin* (1941), 35 Ohio Law Abs. 621. Because the civil law rule so severely restricted the upper riparian owner's opportunity to develop his land, some states[1] have adopted a reasonable use modification to the civil law rule. *Munn* v. *Horvitz Co.* (1964), 175 Ohio St. 521, *certiorari denied*, 379 U. S. 820; *Johnson* v. *Goodview Homes—1, Inc.* (1960), 82 Ohio Law Abs. 526; *Lunsford* v. *Stewart* (1953), 95 Ohio App. 383; *Ratcliffe* v. *Indian Hill Acres, Inc., supra;* *Mason* v. *Commissioners of Fulton County* (1909), 80 Ohio St. 151. When applying this modification to the civil law rule, courts consider the potential gravity of harm which threatens both the upper and lower riparian owners involved in an effort to determine whether an interference or change of a natural watercourse was reasonable under the circumstances.

The reasonable use rule is essentially the same as the reasonable use modification of the civil law rule since the latter holds that an upper riparian owner may not interfere with the natural flow of water unless he acts reasonably, and the former states that surface water may or may not be interfered with, depending upon the reasonableness of the conduct. Fry, *From Good Husbandry to Reasonable Use, supra,* at 173. (*See also,* Bridges, *The Applica-*

---

[1]*See* generally Note, *Drainage of Surface Waters Under the Civil Law Rule As Applied in Maryland,* 11 Md. L. Rev. 58 (1950).

*tion of Surface Water Rules in Urban Areas*, 42 Mo. L. Rev. 76 [1977].)

Finally, the capacity of the stream theory suggests that an upper proprietor may never increase the flow of water within a natural watercourse to the point where the flow would exceed the natural capacity of that watercourse. *McBride* v. *City of Akron* (1894), 12 C. C. 610; *Neff* v. *Sullivan* (1886), 17 Ohio L. J. 168. Although this is a viable principle on which to base a decision in this case, we have chosen the broader, more flexible rule of reasonableness.

The purpose of the rule of reasonableness is to provide a current and adaptable standard by which surface water disputes, particularly in urban areas, may be equitably resolved. Where a lower riparian landowner stands to be seriously damaged by the actions of an upper riparian landowner, who, at a relatively small expense, is in a position to avoid the harm threatened to the servient owner's estate, it is only reasonable and fair that the offending landowner bear the burden of his own actions. The New Jersey Supreme Court held in *Armstrong* v. *Francis Corporation* (1956), 20 N. J. 320, 330, a case involving an individual lowland owner against a building contractor for relief from surface and percolating waters which were collected and discharged in a natural watercourse bordering on the lowland owner's property, that:

"[W]hile today's mass home building projects, of which the Francis development is typical, are assuredly in the social good, *no reason suggests itself why, in justice, the economic costs incident to the expulsion of surface waters in the transformation of the rural or semi-rural areas of our State into urban or suburban communities should be borne in every case by adjoining landowners rather than by those who engage in such projects for profit.* Social progress and the common well-being are in actuality better served by a just and right balancing of the competing interests according to the general principles of fairness and common sense which attend the application of the rule of reason." (Emphasis added.)

In a recent Ohio case, *Masley* v. *Lorain* (1976),

48 Ohio St. 2d 334, the city of Lorain was held responsible for the flooding of plaintiffs' land caused by the city's development of a creek (which served plaintiffs' land) as part of its storm sewer system. In that case, the Court of Appeals for Lorain County found that the city had effectively appropriated the plaintiffs' property by constructing a storm sewer system which channelled a larger volume of water into the creek than the creek could reasonably be expected to handle without flooding. The court remarked at page 340:

"It would be anomalous indeed to hold that a municipality may plan and build a storm sewer system to collect surface water and channel it into a natural watercourse, with knowledge that the watercourse is insufficient to accommodate the flow during rains which can be reasonably anticipated, and thereby cause continual flooding of lower land, without compensation to the owner, despite the municipality's liability for causing surface water to flood the property directly, and its liability for failure to use reasonable care in its construction of a hydraulic system in order to prevent injury to others in times of flooding. This anomaly is particularly apparent where, as here, a different design would have averted the flooding."

In the instant case, the village of Mayfield had repeatedly been made aware of the recurring flooding of the Myotte property, and it even took limited measures towards improving the flood situation by approving the additional 42 inch pipes for the storm sewer system. However, the village failed to implement a real solution to the flooding problem, such as widening the existing watercourse on the Myotte property so that the increased flow of water from the industrial park would be accommodated. Such a solution would represent a relatively small cost to the village, especially in light of the tax income which it receives from the industrial park, and in contrast to the serious harm caused to the market value of Mrs. Myotte's land if the flooding persists.[a] The village's behavior in

---

[a] The appraised value of the Myotte property was determined at trial to be $58,000 absent flooding, and only $13,300 where flooding existed.

this case is analogous to the contractor's behavior in the *Armstrong* case, *supra*, and it is unmistakably unreasonable. The modified judgment of the trial court is affirmed.

*Judgment affirmed.*

Day, C. J., concurs.
Patton, J., dissents.

Day, C. J., concurring. I concur in the judgment, but add some general observations.

The land development in this case caused the acceleration of water flow as a result of changes made to benefit the development. The municipality permitted the development and change which contributed to the flooding condition. The municipal action secured for it an increase in tax revenue stemming from its permissiveness and the developer's initiatives. The down stream landholder had no culpability for the increased flow.

To require the developer to pick up the cost of flood prevention by requiring him to acquire land along stream margins for widening or deepening to accommodate accelerated flow, would subject him to possible overreaching by riparian owners. The developer has no power of eminent domain.

Municipalities do have powers of condemnation. Accordingly, as an advantaged party with the power to protect itself from crisis pricing, it seems reasonable and just that the municipality should either enlarge the stream to accommodate water accelerated from permitted improvements which enrich it or pay the consequences.

Patton, J., dissenting. I respectfully dissent.

In its opinion, the majority takes the position that the reasonable use rule should be applied in the instant case. I tend to agree that this is the rule that is being applied in the more recent cases, wherein the upper riparian landowner diverts the natural flow of rainwater from its natural waterways into the waterways of a lower riparian

landowner, causing excessive flooding. See *Masley* v. *Lorain* (1976), 48 Ohio St. 2d 334.

However, the facts in the *Masley* case are distinguishable from the instant case. In *Masley*, the city implemented a storm sewer construction program to drain storm and surface waters from the property of city residents regardless of the direction of its natural watercourse and channelled the waters to Martin Run Creek. The city had been forewarned that storm improvements were necessary on Martin Run Creek before the sewer construction was completed, in order to carry the increased water flow from additional watercourses which the storm sewer system would cause during heavy rains. In the instant case, waters were not diverted from other watercourses and channelled to the watercourse running in front of Mrs. Myotte's property. The surface waters were collected into sewers and channelled to their natural watercourse, which passed in front of the Myotte property.

This was a reasonable use of the upper landowner's property. The Myotte property owner had to expect that as the upper lands were developed, there would be an increase in the volume of water flowing through the watercourse in front of her property. The upper land owner should not be penalized for the overflow of a natural watercourse in the reasonable use and development of its property. *Oakland Club* v. *South Euclid* (1960), 83 Ohio Law Abs. 153, 165 N. E. 2d 699.

In the concurring opinion of the majority, it is stated that "[t]he down stream landholder had no culpability for the increased flow." This may be true. However, it does beg the question of whether Mrs. Myotte had any culpability as to the increased flooding of her property. The record reflects that prior to any development of the upper riparian estate, there was continuing flooding of the Myotte property whenever there was a heavy rainfall. The evidence also discloses that the natural waterway in front of her property was obstructed and reduced in size by a concrete culvert with a 27 inch pipe to allow drainage water to pass through. If this obstruction was removed, the

watercourse on Mrs. Myotte's property at this point would be at least four to six feet wide and three to four feet deep.

Thus, the removal of the concrete obstruction would cause the water to flow much more freely. It would increase the passageway for the free flow of water three and one-half times greater than with the 27 inch pipe. To what degree it would have alleviated the excessive flooding of Mrs. Myotte's property, we do not know. However, she was advised by the Village of Mayfield to remove the concrete culvert with the 27 inch pipe. She refused. Certainly, the reasonable use rule is just as applicable to the lower riparian landowner as it is to the upper riparian landowner.

The obstruction of the watercourse in front of her property by the concrete culvert certainly contributed to the flooding of her property. As to what degree this contributed to the flooding of her property, we will never know, since she refused to remove the culvert. Her refusal to remove the concrete obstruction was not acting reasonably. If we are going to apply the reasonable use rule, then I do not feel she can be heard to complain when the record reflects she contributed to these damages.

I do not feel it was the duty of the village of Mayfield as indicated by the majority to widen the existing watercourse of the Myotte property. The concrete culvert was on Mrs. Myotte's property. She had it put there and had control over it. The duty was upon her to remove it. Had she done so, and, if the flooding of her property had continued, then I could agree with the majority that it would become the duty of the village to widen the existing watercourse on the Myotte property so that the increased water from the industrial park would be accommodated.

Based on the above, it is my opinion that the judgment of the lower court should be reversed.