ACCURATE DIE CASTING COMPANY, APPELLEE AND CROSS-APPELLANT, *v.* CITY OF CLEVELAND, APPELLANT AND CROSS-APPELLEE.

(No. 42608—Decided June 25, 1981.)

*Messrs. Ray, Robinson, Hanninen & Carle* and *Mr. David G. Davies,* for appellee and cross-appellant.

*Mr. Thomas E. Wagner, Mr. Mark I. Wallach* and *Ms. Jacqueline L. Shuck,* for appellant and cross-appellee.

PARRINO, J.  In its appeal from the Court of Common Pleas of Cuyahoga County, the city of Cleveland, defendant-appellant (city), appeals the order awarding Accurate Die Casting Company,

plaintiff-appellee (plaintiff), $117,960.85 for flood damage to its property and $194,500 for the permanent, partial appropriation thereof. In its cross-appeal, plaintiff contests the amount of the appropriation award. This case concerns the city's storm sewer system, which system incorporates a natural watercourse.

Plaintiff conducts a die-casting operation on its property at 3089 East 80th Street. Plaintiff's property was originally drained by the Kingsbury Run, a natural watercourse which flowed through the property from east to west in a natural, downward slope. During the early 1900's, the city constructed East 80th and East 79th Streets, elevating the grade of the latter street so as to place plaintiff's property in a shallow depression and installing culverts under both streets to permit the Kingsbury Run to flow beneath them. During the 1920's, the city enclosed that portion of the stream between East 80th and East 79th Streets in a seven-foot-diameter, underground storm sewer. The Kingsbury Run continued to flow in its natural state west of East 79th Street, emptying into a ravine and eventually into the Cuyahoga River.

Plaintiff's property flooded in June 1947, August 1947, and March 1948. Plaintiff, alleging that the city's negligence had resulted in flood damage to its property,[1] thereafter brought suit in the court of common pleas. A jury awarded plaintiff $130,000, and this court, in *Accurate Die Casting Co.* v. *Cleveland* (1953), 68 Ohio Law Abs. 230, affirmed the award.

During the pendency of the litigation and shortly thereafter, two additional underground storm sewers were built. The city constructed the nine-foot-diameter Kingsbury Run Relief Sewer, and plaintiff constructed a seven-foot-diameter private sewer.[2] Thus, three independent storm sewers drained plaintiff's property and flowed into the ravine west of East 79th Street.

In 1954, the city began construction of the Garden Valley Apartments in the area west of East 79th Street, filling in the ravine and enclosing its streams in underground storm sewers. The city connected the original Kingsbury Run sewer and plaintiff's seven-foot-diameter private sewer to a 7' by 6'3½" rectangular sewer and then connected the rectangular sewer and the Kingsbury Run Relief sewer to a 12' by 8'6" rectangular sewer.[3]

On August 24, 1975, heavy rains flooded plaintiff's property for the first time since 1948. Plaintiff thereafter brought suit in the court of common pleas, seeking compensation for flood damage to its property[4] and compensation for the permanent, partial appropriation thereof,

---

[1] Plaintiff's complaint was premised upon two grounds. Plaintiff contended, first, that the city artificially increased the watershed's area and then directed its waters into storm sewers which the city knew were inadequate to handle heavy rainfalls, so that waters flowed onto plaintiff's property. Plaintiff contended, second, that the city, by elevating the grade of East 79th Street, created a barricade, so that waters were prevented from escaping plaintiff's property.

[2] Thereafter, plaintiff constructed improvements on its property, including additional buildings and parking lots. Under the improvements, plaintiff constructed a four-foot-diameter storm sewer, which connected and fed its seven-foot-diameter sewer.

[3] The record does not demonstrate when construction of the Garden Valley storm sewers was completed. Although it contains much evidence that construction was completed in the mid-1950's, it also contains the city's admission "that it constructed a culvert in the ravine west of E. 79th Street, said ravine being called the Kingsbury Run, in stages during the late 1950's and early 1960's [and] that the ravine was filled over such culvert."

[4] Plaintiff contended that the city artificially increased the watershed's area and that the

*i.e.*, for the deprivation of use occasioned by frequent flooding.

At the trial, both parties presented expert testimony as to whether the city had artificially increased the watershed, *i.e.*, diverted additional waters to the drainage system. Plaintiff's expert contended that the natural watershed, *i.e.*, the area drained by the Kingsbury Run, contained 1,560 acres and that the artificial watershed, *i.e.*, the area drained by the city's storm sewer system, contained 2,900 acres. The city's expert, although he contended that the entire Kingsbury Run watershed had been reduced from 5,548 acres to 4,705 acres, admitted that the area drained by the tributary at East 80th Street had been increased from 2,148 acres to 2,742 acres.

Both parties presented expert testimony as to the frequency with which storms of an intensity and duration similar to those of the storm of August 24, 1975, could be expected. Plaintiff's expert, basing his calculations on records which demonstrated that approximately two inches of rain fell in the storm's first hour, testified that the storm of August 24, 1975, was a fifteen-to-twenty-five-year event. The city's expert, on the other hand, basing his calculations on records which demonstrated that approximately four inches of rain fell in four hours, testified that the storm was a hundred-year event.[5]

Both parties also presented expert testimony as to the capacity of the city's storm sewer system. Plaintiff's expert testified that the capacity of the original Kingsbury Run sewer is 1,288 cubic feet per second (cfs), that the capacity of plaintiff's seven-foot-diameter private sewer is 1,107 cfs, and that the capacity of the Kingsbury Run Relief sewer is 1,705 cfs. Plaintiff's expert testified that the city connected the original Kingsbury Run sewer and plaintiff's private sewer to a 715 cfs-capacity rectangular sewer and then connected the rectangular sewer and the Kingsbury Run Relief sewer to a 2,090 cfs-capacity rectangular sewer. Plaintiff's expert contended that the city, when it connected the three independent storm sewers to a single sewer incapable of handling their combined flows, restricted their effectiveness and rendered the entire system incapable of handling a ten-year storm. He also contended that the city, when it elevated the grade of East 79th Street, prevented surface waters from escaping plaintiff's property by overland flow. The city's expert testified that the storm sewer system can accommodate slightly less than a ten-year storm, that design standards at the time of its construction required that systems in industrial areas accommodate only five-year storms, and that few urban systems can accommodate hundred-year storms.[6]

Both parties, finally, presented evidence as to plaintiff's damages. Plaintiff's vice president testified that plaintiff sustained $117,960.85 in flood damage,

---

[5] The city's expert testified that the storm city, by connecting the three storm sewers which drained plaintiff's property to a single sewer which it knew was inadequate to handle heavy rainfalls, rendered the three sewers inadequate, so that waters backed up and flowed onto plaintiff's property. Plaintiff also contended that the city, by elevating the grade of East 79th Street and by filling the ravine to an elevated grade similar to that of East 79th Street, created a barricade, so that waters were prevented from escaping plaintiff's property.

[5] The city's expert testified that the storm of June 1947, had been a four-year event, that the storm of August 1947, had been a fifteen-year event, and that the storm of March 1948, had been a six-year event. The city, moreover, in additional support of its defense that the storm of August 24, 1975, was an Act of God, presented evidence that it had had disastrous effects throughout the entire city of Cleveland.

[6] The city's expert also testified that plaintiff itself limited the effectiveness of its seven-foot-diameter private sewer by preceding it with a four-foot-diameter, 64 cfs-capacity sewer.

including $22,038 to compensate employees for time spent in plant cleanup and $36,000 for loss of plant use. Plaintiff presented expert testimony that the value of its property, presuming the property had no tendency to flood, was $675,000 in August 1975, and that the tendency to flood, which rendered the property suitable for only limited purposes, e.g., marginal warehousing, decreased that value to $375,000. Plaintiff also presented expert testimony that the liquidation value of its fixtures was approximately $700,000 in August 1975; that their value in place was approximately $805,000; that, if the property had been sold to another die caster, i.e., if the property had been sold for its highest and best use, the fixtures would have added approximately $150,000 to the sales price; and that, if the property had been sold to an ordinary buyer, the fixtures would have added only $50,000, i.e., their salvage value. Plaintiff, finally, presented expert testimony that the cost of cure, i.e., the cost of floodproofing the property by building a flood wall around it, was $389,000 in August 1975. The city presented expert testimony that the value of plaintiff's property was $550,000 in August 1975, and that the flood of August 24, 1975, because it was a hundred-year event, had no effect on value.

On June 4, 1980, the trial court awarded plaintiff $117,960.85 for flood damage to its property and $194,500 for the permanent, partial appropriation thereof. In its timely appeal to this court, the city assigns eight errors.

In its first assignment of error, the city urges that the defense of sovereign immunity precludes a judgment for flood damage:

"I. The trial court erred in applying the law of riparian rights, rather than the law applicable to municipal design and construction of storm sewer systems."

We disagree.

Admittedly, the Ohio Supreme Court has held that the defense of sovereign immunity precludes liability for damages caused by a municipality's negligent design of its storm sewer system. *Hutchinson* v. *Lakewood* (1932), 125 Ohio St. 100; *Portsmouth* v. *Mitchell Mfg. Co.* (1925), 113 Ohio St. 250. However, the Supreme Court has not determined whether, when a municipality superimposes its storm sewer system upon a natural watercourse, the defense of sovereign immunity also precludes liability for damages caused by any attendant abridgement of riparian rights.[7]

Riparian rights are property rights, *Mansfield* v. *Balliett* (1902), 65 Ohio St. 451, which entitle riparian owners to use the watercourse which flows on or adjacent to their property, subject only to the requirements that they do so reasonably and that they submit to the reasonable use made thereof by others. *Myotte* v. *Mayfield* (1977), 54 Ohio App. 2d 97 [8 O.O.3d 202]; *Chudzinski* v. *Sylvania* (1976), 53 Ohio App. 2d 151 [7 O.O.3d 156]. See, also, *McGlashan* v. *Spade Rockledge Corp.* (1980), 62 Ohio St. 2d 55 [16 O.O.3d 41].

A municipality may be a riparian owner, enjoying the rights and enduring the liabilities of riparian ownership. *Canton* v. *Shock* (1902), 66 Ohio St. 19. Thus, a municipality may design its storm sewer system to conjoin a natural watercourse, provided that any effect on the natural watercourse is consistent with the municipality's riparian rights, i.e., provided that the conjunction is reasonable. *Munn* v. *Horvitz Co.* (1964), 175 Ohio St. 521 [26 O.O.2d 208], certiorari denied (1964), 379 U.S. 820. If, however, the con-

---

[7] Riparian rights are those enjoyed by a riparian owner, i.e., by "[o]ne who owns land on bank of river, or one who is owner of land along, bordering upon, bounded by, fronting upon, abutting or adjacent and contiguous to and in contact with river. * * *" Black's Law Dictionary (5 Ed. 1979), at page 1192 (riparian owner).

junction is unreasonable, and if flood damage results therefrom, the municipality may be held liable therefor. *Myotte* v. *Mayfield, supra; Chudzinski* v. *Sylvania, supra; Price* v. *Akron* (1926), 23 Ohio App. 513. See, also, *Masley* v. *Lorain* (1976), 48 Ohio St. 2d 334 [2 O.O.3d 463].

Admittedly, the city in the instant case did not design its storm sewer system merely to conjoin a natural watercourse; rather, the city enclosed the entire watercourse within storm sewer pipes so that no portion thereof continued to flow in its natural state. We see no reason, however, to permit the city's urban development to abrogate the riparian rights acquired by plaintiff when it acquired its property. Accordingly, we hold that, when a municipality superimposes its storm sewer system upon a natural watercourse, it must do so in a manner consistent with the riparian rights of adjoining landowners, *i.e.*, it must do so reasonably. We hold that, when a municipality superimposes its storm sewer system upon a natural watercourse, the defense of sovereign immunity does not preclude liability for damages caused by any attendant abridgement of riparian rights. Accordingly, we overrule the first assignment of error.

In the second and third assignments of error, the city urges that its construction of a ten-year storm sewer system was reasonable, thereby satisfying the standard for resolution of drainage disputes and precluding liability for drainage damages:

"II. The trial court erred in its failure to apply the reasonable use balancing test in its application of the law of riparian rights.

"III. Even if a municipality could be held liable for negligent construction of a sewer system, the court's finding of negligence was against the weight of the evidence."

We disagree.

Admittedly, the reasonable use rule provides the standard for resolution of drainage disputes. *McGlashan* v. *Spade Rockledge Corp., supra; Myotte* v. *Mayfield, supra; Chudzinski* v. *Sylvania, supra.* The trial court, however, did not find that the city's construction of a ten-year storm sewer system was unreasonable; rather, its imposition of liability was premised upon the city's failure to provide for the overland flow which it knew would occur at intervals of approximately ten years. Specifically, the trial court found that the city acted unreasonably, *i.e.*, abridged plaintiff's riparian rights, by (1) substantially increasing the watershed's area; (2) constructing East 80th and East 79th Streets so as to place plaintiff's property in an "artificial depression"; (3) constructing, in conjunction with its construction of the Garden Valley Apartments, storm sewers which it knew would surcharge at intervals of approximately ten years, thereby forcing water onto plaintiff's property and restricting the flow therefrom; (4) connecting the original Kingsbury Run sewer, the Kingsbury Run Relief sewer, and plaintiff's private sewer to a sewer inadequate to carry their combined capacities; and (5) filling in the ravine and constructing underground storm sewers which substantially diminished the ravine's "flow capacity and/or ponding capacity." We agree and, therefore, overrule the second and third assignments of error.

In the fourth and fifth assignments of error, the city urges that the trial court erred in awarding damages:

"IV. The trial court erred in awarding damages for alleged clean-up expense because no evidence of actual expense was offered at trial, only conjecture.

"V. The trial court erred in awarding ADC [plaintiff] damages for alleged loss of use of plant."

We disagree.

It is undisputed that plaintiff's plant was flooded, that a residue of mud remained when the flood waters receded, and that plaintiff's employees spent ap-

proximately two weeks in cleaning up the plant, during which two-week period they gradually resumed production. The city contends that the absence of actual records of cleanup time renders proof of those damages uncertain and precludes recovery therefor. It is uncertainty as to the *existence* of damages, however, and not uncertainty as to their amount, which precludes recovery. See Annotation 78 A.L.R. 858. The city, moreover, failed to disclose any flaw in plaintiff's calculations,[8] and the trial court found that those calculations were premised on "established experience and direct inference from known circumstances, which, though not exact, are fairly definite standards, not mere speculation or conjecture." Accordingly, we overrule the fourth assignment of error.

It is undisputed that plaintiff was temporarily deprived of the use of its plant after the flood. The city contends that loss of use should have been measured by rental value, not cash flow. The Ohio Supreme Court, however, has held that the measure of temporary damage to real property is the value of its use to the injured owner-occupant. *Norwood* v. *Sheen* (1933), 126 Ohio St. 482; *Cincinnati* v. *Evans* (1855), 5 Ohio St. 594. Accordingly, we overrule the fifth assignment of error.

In the sixth assignment of error, the city urges that its construction of a ten-year storm sewer system did not result in the permanent, partial appropriation of plaintiff's property:

"VI. The trial court erred in finding that there has been a 'permanent partial taking' of ADC's property."

We agree.

Admittedly, the Supreme Court has held that frequent flooding which results from the construction of a public improvement and which deprives an owner of the use and enjoyment of his property constitutes a taking, for which compensation is required. *Masley* v. *Lorain, supra; Lucas* v. *Carney* (1958), 167 Ohio St. 416 [5 O.O.2d 63]. The potential of plaintiff's property to flood at intervals of "not substantially more than ten years," however, does not constitute the frequent flooding required by the decisions of the Supreme Court. Cf. *Masley* v. *Lorain, supra* (48 Ohio St. 2d 334 [2 O.O.3d 463]), at page 335 (flooding "* * * [d]uring periods of heavy rains"); *Lucas* v. *Carney, supra,* at page 418 (flooding "* * * during and immediately after every rain and upon the melting of ice and snow"). Accordingly, we find the sixth assignment of error well taken, and we reverse the trial court's award of damages for permanent, partial appropriation.

Our disposition of the sixth assignment of error renders the seventh and eighth assignments of error moot:

"VII. The trial court erred in awarding damages under count two of the amended complaint based upon 'cost of cure.'

"VIII. The trial court erred in failing to hold ADC's second count barred by the statute of limitations."

App. R. 12(A), however, requires that we pass upon each assignment of error. We note, therefore, that damages for the

---

[8] Plaintiff's vice-president testified that the plant was cleaned up by the supervisors, who devoted the full two weeks to the task, and by the indirect labor, *i.e.,* employees engaged in packing, inspection, *etc.,* who divided the two weeks between the cleanup and the production, which resumed as cleanup progressed and as the direct production labor was gradually recalled to work. Plaintiff calculated the ratio of indirect labor's wages to direct labor's wages for an ordinary week and for the two weeks following the flood. Plaintiff contended that the increased percentage of indirect-labor's wages for those two weeks, together with the supervisor's wages for those weeks, comprised a conservative estimate of cleanup expenses.

permanent, partial appropriation of property are measured by diminution in value; that such damages are limited to the "cost of cure," *Columbus* v. *Farm Bureau Cooperative Assn.* (1971), 27 Ohio App. 2d 197 [56 O.O.2d 382]; that plaintiff presented evidence that the diminution in value was $400,000; and that the trial court properly limited plaintiff's damages to $389,000, the cost of cure. Accordingly, we overrule the seventh assignment of error. We also note that, because the city admitted that it constructed portions of its storm sewer system within the twenty-one years preceding the flood, we need not determine whether plaintiff's claim was barred by a twenty-one-year statute of limitations. Accordingly, we overrule the eighth assignment of error.

Our disposition of the city's sixth assignment of error also renders the sole error assigned in plaintiff's cross-appeal moot:

"The trial court's findings that the city-imposed threat of flooding had caused damage to Accurate's property in the amount of $389,000 compelled a judgment in that amount without regard to subsequent history and forbade an award of only half damages."

We note, however, that the cost of cure is the amount required to restore the property to its original value, *Columbus* v. *Farm Bureau Cooperative Assn., supra* (27 Ohio App. 2d 197 [56 O.O.2d 382]), and that the trial court erred in finding "that plaintiff should contribute toward the cure of the flood problem in the amount of one-half of the amount of damages as the value of the real estate shall be enhanced." Accordingly, plaintiff's sole assignment of error is well taken.

The judgment of the Court of Common Pleas of Cuyahoga County is affirmed in part and reversed in part.

*Judgment affirmed in part,*
*and reversed in part.*

CORRIGAN, P.J., and CELEBREZZE, J., concur.